IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| CHRISTINE BORDEN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) CASE NO.: 2:22-cv-04076-BHH |
| BANK OF AMERICA, NA ("BANA") | ) |
| AND WESTCLIFF TECHNOLOGIES, | ) |
| INC., D/B/A NATIONAL BITCOIN ATM, | ) |
| AND CASH CLOUD, INC., D/B/A/ COIN | ) |
| CLOUD, | ) |
| | ) |
| Defendants. | ) |

PLAINTIFF'S RESPONSE TO WESTCLIFFS
MOTION TO DISMISS AMENDED COMPLAINT

## I.    INTRODUCTION

This lawsuit comes before the court by Plaintiff Christine Borden's ["Plaintiff"]

Amended Complaint for relief against the various Defendants as a result of a cryptocurrency

scam perpetrated against Plaintiff. On October 11, 2022, Plaintiff filed her initial Complaint

("Complaint" in the Court of Common Pleas for the Fifteenth Judicial Circuit, Georgetown

County, South Carolina, against Defendants Bank of America, NA ("BANA"); Westcliff

Technologies, Inc. D/B/A National Bitcoin ATM ("Westcliff"); and Cash Cloud, Inc., D/B/A

Coin Cloud (Cash Cloud). On November 16, 2022, BANA removed the case to this Court.

In her Amended Complaint (ECF. 8) Plaintiff alleges six causes of action against

Defendant Westcliff, whose "Bitcoin Teller Machine" (BTM) took $43,500 of Plaintiff's life

savings, as follows:

(1) that Westcliff violated S.C. Code § 43-35-87(H), a provision of the Omnibus Adult Protection Act. S.C. Code § 43-35-5;

(2) that Westcliff violated the South 2 Carolina Unfair Trade Practices Act, S.C. Code § 39-5-10, *inter alia,* by taking "as fees" a percentage of the money stolen from Plaintiff, **which it retains to this day**;

(3) that Westcliff was negligent, including in supervision and training, and the disregard of Title 43 constitutes negligence per se;

(4)  that Westcliff (unlike other crypto kiosk providers) failed to warn Plaintiff about the dangers of the scam to which she fell victim, and that such warnings would be required due to the known, ultrahazardous character of Westcliff's devices to foreseeable victims, such as Plaintiff;

(5) that Westcliff's taking and retention of Plaintiff's stolen money constitutes conversion; and that

(6) Westcliff has been unjustly enriched by the taking and retention of Plaintiff's money, including via the percentage "fees" it retains to date.


None of the claims in Plaintiff's Amended Complaint should be dismissed.  They comply with the Rule 8 Standard, because they are "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Further, Plaintiff's claims against Westcliff withstand the 12(b)(6) motion to dismiss because:

 (1) a private right of action is inferable under S.C. Code § 43-35-87(H) through legislative intent;

(2) the public interest is served by curbing Westcliff's harmful, repetitive conduct per the intent S.C. Code § 39-5-10, et. seq.,

(3) because Westcliff has been warned by the FTC specifically of this type of fraud, but ignored said warnings and breached a duty of care to foreseeable Plaintiff, whose claims are not barred by the economic loss rule;

(4) that Plaintiff's assertion that Westcliff's actions are ultrahazardous activity withstands the pleading because Westcliff's activities pose such a high degree of risk (i.e., the loss of a senior's life savings in the span of a few minutes) that they cannot be made more secure merely by exercising greater caution, and require – at minimum – clear, express warnings that Defendant chose not to include (and whose absence financially benefitted Westcliff);

(5) because Westcliff's taking of Plaintiff's money – and continued exercise of control of the portion retained as "fees" constitute conversion; and

(6) because Plaintiff's claim for unjust enrichment does not fail simply because she initially did not believe she was being scammed (as indeed, no victim of a scam ever "knows" that she's not being scammed from the outset).

## II.    FACTS

In February of 2022, Plaintiff received communication form individuals purporting to be Microsoft customer support representatives. Plaintiff, who is a 73 year-old woman who is not, by her own admission, technologically experienced, believed these individuals to be who they claimed to be. In reality, these unscrupulous individuals were scammers, and, through this act of deception, were able to gain access to Plaintiff's computer and phone. (ECF 8, ¶29). Following their infiltration of Plaintiff's private devices, the scammers intimated to Plaintiff that her financial accounts were in danger of being exploited by a fraud ring within the bank itself. (ECF

8, ¶¶ 29-33). Accordingly, they counseled that Plaintiff was to withdraw the entirety of her monetary resources kept in a Bank of America account. *Id.* Trusting, due to her lack of expertise regarding computers, that the scammers were indeed well-meaning Microsoft employees, Plaintiff arrived at her local branch of Bank of America, located in Georgetown, requesting a withdrawal of $31,000.00. *Id.* at, ¶35. The employees at the Georgetown branch advised her that a small-town bank such as theirs did not carry such an exorbitant amount of cash, and that she should visit the branch located in tourist hot-spot Myrtle Beach if she should desire to withdraw her entire life savings. *Id.* at p. 10, ¶38. In accordance with the advice given by Bank of America employees, Plaintiff promptly drove north to Myrtle Beach, withdrawing $31,000.00 from her Bank of America account in Myrtle Beach. *Id.* Following this high-priced withdrawal, Plaintiff deposited the money withdrawn from her account as directed, into bitcoin ATMs that were owned by Defendants Westcliff and Cash Cloud. *Id*. at p. 11, ¶48-50.

In the ensuing days, the scammers, still having access to Plaintiff's devices as a result of her own trust in strangers, discovered that Plaintiff held a substantial fortune in a retirement account. Upon learning of this veritable pot of gold, the scammers beseeched Plaintiff to deposit $70,899.00 into her Bank of America Account for withdrawal. *Id.* at p. 10, ¶¶ 39-40. On February 22, 2022, she transferred the funds as instructed, and was allowed by BANA employees to withdraw $40,000.00 from the account immediately. *Id.* at p. 10, ¶¶ 40-41. Next, she deposited the $40,000.00 as directed into bitcoin ATMs owned by Defendants Westcliff and Cash Cloud. *Id.* at p. 11, ¶¶ 48-50.

Accordingly, Plaintiff brought claims against Defendant Westcliff for violation of the S.C. Code § 43-35-87(H) and various forms of Negligence. On December 21, 2022, Defendant

Westcliff filed a Rule 12(b)(6) Motion to Dismiss the Complaint with regard to itself. (ECF. 9-1).[1][2]

## III.    STANDARD OF REVIEW

Under Rule 8(a)(2), all a complaint needs to pass muster is to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In order to meet this standard, all a Plaintiff need not enter a "fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

A Motion to Dismiss for an alleged violation of the Rule 8 standard is filed under the Rule 12(b)(6) standard for "failure to state a claim upon which relief can be granted." Fed R. Civ. P. 12(b)(6). Dismissal is proper under this rule only "if [the complaint] tenders 'naked assertion[s]' devoid of 'further factual elaboration.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 669 (2009) (*quoting Twombly*, 550 U.S. at 549). Nonetheless, the court, in reviewing such a claim is required to accept all of the factual allegations contained within the complaint as true, even though it is "not bound to accept as true a legal conclusion as a factual allegation." *Iqbal,* 556 U.S. at 678 (*quoting Twombly*, 550 U.S. at 550).

A court should not grant a Rule 12(b)(6) motion unless the plaintiff can prove no set of facts that would support their claim and would entitle them to relief. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). When considering a Rule 12(b)(6) motion, the court

---

[1] The motion to dismiss filed by Westcliff appears to be addressed to the Initial Complaint. An Amended Complaint was filed on 12/19/22 (three days before Westcliff's motion to dismiss) which is the current pleading on file. In an abundance of caution, however, we're responding to Westcliff's Motion to Dismiss the original complaint.

[2] In their motion, Defendant Westcliff raises, but does not argue, the issue of arbitration. Accordingly, Plaintiff does not address this issue, as it is not the basis of Defendant Westcliff's Motion.

should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff. *Ostrzenski v. Seigel*, 177 F.3d 245, 251 (4th Cir. 1999); *Mylan Labs., Inc.*, at 1134. 3:18-cv-02394-JFA Date Filed 09/24/18 Entry Number 12 Page 2 of 123.

A Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted "challenges the legal sufficiency of a complaint." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009) (citations omitted). To be legally sufficient, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) (2012). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

The question on a Rule 12(b)(6) motion is not whether the plaintiffs ultimately will prevail, but whether the plaintiffs may proceed in litigation. *Skinner v. Switzer*, 131 S. Ct. 1289 (2011)

## IV.    ARGUMENT

### A.  PLAINTIFF'S ELDER ABUSE CLAIM PURSUANT TO S.C. CODE § 43-35-87(H) WITHSTANDS THE 12(b)(6) STANDARD.

**1.  S.C. Code § 43-35-87(H) specifies an implicit (if not explicit) private right of action.**

Though the plain language of S.C. Code § 43-35-87(H) does not contain an explicit private right of action for vulnerable adults against financial institutions, this Court may, as other courts have done, imply such a right of action, consistent with the legislatively intended purpose of the Omnibus Adult Protection Act.

The relevant provision of the Act states:

If the determinations and actions of a financial institution or an employee of a financial institution are made in good faith and in accordance with the provisions of this section, then the financial institution or employee shall be immune from criminal, civil, or administrative liability for declining transactions to disburse monies pursuant to this section, and for taking actions in furtherance of a determination, including making a report or providing access to or copies of relevant records to an investigative entity or law enforcement agency. Nothing in this section is intended to nor does it limit or shield in any manner a financial institution from civil liability against any claim, including reasonable attorneys' fees, costs, and litigation expenses, for participating in or materially aiding the financial exploitation of a vulnerable adult. Any such claims shall be asserted by the vulnerable adult, or on his behalf by an appropriate guardian or representative who is not involved in or otherwise suspected of participating in the financial exploitation of the vulnerable adult, by filing a civil action in circuit court.

S.C. Code § 43-35-87(H).

Defendant Westcliff is incorrect in its assertion that the legislature did not intend for a private right of action to be created under this provision. They state that there has not been a single action brought under this provision since its enactment, so that must mean that there is no possible private action that can be brought. While it is true that no action has yet been brought under this provision, that does not mean that none can be brought. It is also true that this provision is a recent addition to the Omnibus Adult Protection Act, codified as S.C. Code §43-35, which was amended in 2021 to include the above-quoted section. SC LEGIS. 84 (2021), 2021 South Carolina Laws Act 84 (S.425); *See also* 12 S.C. Jur. Governor § 49.1. Since this provision was enacted less than two years ago, this logic that no action has been brought, therefore no action can be brought is unsound. A much more realistic assumption from this lack of jurisprudence is that no party has had the opportunity to have asserted such a claim in the short time since enaction. Further, just because something has not been done before in law does not mean that it is not able to be done. In fact, this amendment was adopted explicitly in order to "authorize financial institutions to decline certain transaction requests in cases of the suspected financial exploitation of vulnerable adults." *Id.*

7

If the Court does not, however, agree with Plaintiff that the above-quoted language clearly intends for the creation of a private right of action, a private right of action may be easily implied from the legislative intent behind the Omnibus Adult Protection Act. "In determining whether a statute creates a private cause of action [in South Carolina], the main factor is legislative intent." *Doe v. Marion*, 645 S.E.2d 245, 248 (S.C. 2007) (finding that the statute for reporting child abuse does not support a private cause of action for negligence per se against a doctor).

> The legislative intent to grant or withhold a private right of action for violation of a statute or the failure to perform a statutory duty is determined primarily from the language of the statute . . . . In this respect, the general rule is that a statute which does not purport to establish a civil liability, but merely makes provision to secure the safety or welfare of the public as an entity is not subject to a construction establishing a civil liability. When a statute does not specifically create a private cause of action, one can be implied only if the legislation was enacted for the special benefit of a private party.

*Id*. (internal citations omitted). As demonstrated previously, the language of the relevant statute explicitly denotes an intention of creating a civil liability, where it says: "Nothing in this section is intended to nor does it limit or shield in any manner a financial institution from civil liability against any claim . . . . Any such claim shall be asserted by the vulnerable adult" S.C. Code § 43-35-87(H).

Further, such a private right of action is consistent with the purpose of the Omnibus Adult Protection Act. In the *Williams v. Watkins* case, the South Carolina Court of Appeals stated that the purpose of the Act which contains S.C. Code § 43-35-87(H) is to:

> [A]ddress the continuing needs of vulnerable adults; define abuse, neglect, and exploitation in a uniform manner, without regard to setting; clarify reporting requirements; provide victims with emergency protective custody; define the court's role in adult protection; and **provide civil and criminal penalties to perpetrators of the abuse, neglect, or exploitation of vulnerable adults.**

*Williams v. Watkins*, 665 S.E.2d 243, 245 n. 3 (Ct. App. 2008) (emphasis added). This purpose language specifically denotes an intention to "provide civil . . . penalties to perpetrators of . . . vulnerable adults." *Id.* Civil penalties can only be instituted if civil suits may be filed. Accordingly, the legislature clearly intended for the statute within which exists S.C. Code § 43-35-87(H) to contain a private right of action.[3] Thus, Plaintiff may sue under such an action.


2.     **Plaintiff is a "Vulnerable Adult" entitled to protection by the Omnibus Adult Protection Act.**

Despite what is claimed by Defendant Westcliff, Plaintiff is a vulnerable adult with respect to the definition from S.C. Code § 43-35-10.

The Omnibus Adult Protection Act, as previously stated, exists in part to "provide civil and criminal penalties to perpetrators of the abuse, neglect, or exploitation of vulnerable adults." *Watkins*, 665 S.E.2d at 245 n. 3. Thus, in order to qualify for such a private action for civil damages, the plaintiff must be a "vulnerable adult." A vulnerable adult, as proffered by S.C. Code § 43-35-10(11) is

> [A] person eighteen years of age or older who has a physical or mental condition which substantially impairs the person from adequately providing for his or her own care or protection. This includes a person who is impaired in the ability to adequately provide for the person's own care or protection because of the infirmities of aging including, but not limited to, organic brain damage, advanced age, and physical, mental, or emotional dysfunction.

S.C. Code § 43-35-10(11).

Plaintiff is 73 years old, which by almost all metrics clearly qualifies her as person of "advanced age." Further, while it is true that she does live on her own, she lives off of nothing

---

[3] See also, §43-35-80(A) which references the availability of a "private civil action" in addition to actions by the SC Attorney General.

but her $1,250 dollar a month social security check. This equates to nothing more than $15,000

dollars a year, an income which puts her in a bracket just above the poverty line. "Income

Guidelines," https://sclegal.org/income-guidelines/ (last visited Dec. 14, 2022). Further, her

advanced age led her to being a prime target for scammers, resulting in the loss of nearly

$100,000 of her own personal savings. This alone evidences why Plaintiff is unable to

"adequately provide for the [her] own care or protection." Thus, Plaintiff is a "vulnerable adult"

under the meaning of the statute.


### B.  PLAINTIFF'S SCUPTA CLAIM WITHSTANDS THE 12(b)(6) STANDARD.

Under SCUTPA, unfair methods of competition and unfair or deceptive acts or practices

in the conduct of any trade or commerce are deemed unlawful.  S.C. Code Ann. § 39-5-20 (1985,

Supp. 2001). "To recover in an action under the Act, the plaintiff must show: (1) the defendant

engaged in an unfair or deceptive act in the conduct of trade or commerce; (2) the unfair

or  deceptive act affected public interest; and (3) the plaintiff suffered monetary or property loss

as a result of the defendant's unfair or deceptive act(s)." *Turner v. Kellett*, 824 S.E.2d 466, 469

(S.C. Ct. App. 2019).   A trade practice is unfair when it is "offensive to public policy or when it

is immoral, unethical, or oppressive." *Beattie v. Nations Credit Fin. Servs. Corp.*, 69 F. App'x

585, 588 (4th  Cir.  2003).   A trade practice is deceptive "when it has a tendency to deceive."

*Johnson v. Collins Ent. Co*., 564 S.E.2d 653, 665 (S.C. 2002).

In order to bring a private cause of action under SCUTPA, plaintiff must plead and prove

that the defendant's actions adversely affected the  public  interest.  *Noack Enterprises, Inc.  v.*

*Country Corner Interiors, Inc.*,  351  S.E.2d  347,  349-350 (S.C.  Ct. App.1986) (*citing Zeeman*

*v.  Black*, 273 S.E.2d  910,  915  (Ga. Ct. App. 1980). Conduct that only affects the parties to the

transaction provides no basis for a SCUTPA claim. *Robertson v. First Union Nat'l Bank*, 565 S.E.2d 309, 315 (S.C. 2002) (citing *Jefferies v. Phillips*, 316 S.C. 523, 527, 451 S.E.2d 21, 23 (S.C. Ct. App. 1994)).

In order for a plaintiff to prove that a public interest is adversely affected it may show that "the acts or practices have the potential for repetition." *Singleton v. Stokes Motors, Inc*., 595 S.E.2d 461, 466 (S.C. 2004). This can be established "(1) by showing the same kind of actions occurred in the past, thus making it likely they will continue to occur absent deterrence, or (2) by showing the company's procedures create a potential for repetition of the unfair and deceptive acts." *Daisy Outdoor Advert. Co. v. Abbott*, 473 S.E.2d 47, 51 (1996).

Public interest in this case can be shown by potential for repetition, including fact that Defendant Westcliff repeated the same conduct that it enacted toward defendant over multiple transactions. Further, as is alleged in the complaint, many bitcoin ATMs contain warnings to customers about the possibility that transactions demanding payment in bitcoin often stem from scams. (ECF 8, ¶¶ 26-28). The ATMs owned by defendant Westcliff contain no such warnings. It is highly improbable that, since many people are unaware of the complexities of this new form of currency, that Plaintiff is the only person utilizing this service who is unaware of bitcoin scams. With this in mind, the conduct is clearly in danger of repetition, an especially troubling fact considering that Defendant Westcliff keeps a percentage of the deposit, even in cases where, like here, the depositor was clearly scammed. Thus, Plaintiff's SCUPTA claims are amply pled to pass the pleading stage.

### C.  PLAINTIFF'S NEGLIGENCE CLAIMS WITHSTANDS THE 12(b)(6) STANDARD.

Plaintiff has asserted a negligence claim for ""Negligence Per Se/Negligent Supervision and Training, Banking Negligence" (ECF 8).

Under South Carolina law, "to establish a cause of action in negligence, three essential elements must be proven: (1) duty of care owed by defendant to plaintiff; (2) breach of that duty by a negligent act or omission; and (3) damage proximately resulting from the breach of duty." *Bishop v. S.C. Dep't of Mental Health,* 331 S.C. 79, 88, 502 S.E.2d 78, 82 (1998).

1.  **Plaintiff states a claim for Negligence and Negligence Per Se because statutory duties were breached, and Plaintiff is a party intended to be protected by the statute.**

Plaintiff's Complaint asserts that Westcliff breached the standard of the South Carolina Omnibus Adult Protection Act which constitutes negligence per se. (See ECF 8  ¶¶85-86).   Westcliff is correct in stating that a statute must create a private cause of action in order for a party to bring forth an action of negligence per se. *Doe v. Marion*, 645 S.E.2d 245 (2007)."In determining whether a statute creates a private cause of action, the main factor is legislative intent . . . ." Id. at 398. Further, in order to identify legislative intent the court must look first to the language of the statute. *Companion Prop. & Cas. Ins. Co. v. U.S. Bank Nat'l Ass'n, Case* No. 3:15-CV-01300-JMC, 2016 WL 3027552, at *8 (D.S.C. May 27, 2016)(citing *Doe v. Marion*, 645 S.E.2d 245 (2007)). The problem with Westcliff's argument is that it does not give a *complete* reading of the plain text of the statute. Instead, Defendant Westcliff stops at the second-to-last sentence of the statute, where the text discusses the lack of absolute immunity against civil liability that is held by financial institutions.

If Defendant Westcliff read one sentence further, they would find that the legislature expressly contemplated civil actions to be filed against financial institutions who violate its

provisions. In relevant part, the statute reads: "Any such claims shall be asserted by the vulnerable adult, or on his behalf by an appropriate guardian or representative who is not involved in or otherwise suspected of participating in the financial exploitation of the vulnerable adult, by filing a civil action in circuit court." S.C. Code § 43-35-87(H). This language clearly evidences an intent by the legislature to allow private parties—the aforementioned "vulnerable adult[s]"—to file "a civil action in circuit court."

Additionally, this clearly comports with the overall purpose of the Omnibus Adult Protection Act, (of which § 43-35-87(H) is a part) which is to:

> [A]ddress the continuing needs of vulnerable adults; define abuse, neglect, and exploitation in a uniform manner, without regard to setting; clarify reporting requirements; provide victims with emergency protective custody; define the court's role in adult protection; and **provide civil and criminal penalties to perpetrators of the abuse, neglect, or exploitation of vulnerable adults.**

*Williams v. Watkins*, 665 S.E.2d 243, 245 n. 3 (Ct. App. 2008) (emphasis added).  Without a private right of action, it is very difficult for the courts to "provide civil and criminal penalties to perpetrators of the abuse, neglect, or exploitation of vulnerable adults." *Id.* Accordingly, a private cause of action does exist under S.C. Code § 43-35-87(H).

In order to prove Negligence Per Se, the party bringing the claim must demonstrate that "(1) the essential purpose of the statute is to protect from the kind of harm the plaintiff has suffered; and (2) the plaintiff is a member of the class of persons the statute is intended to protect." *J.R. v. Walgreens Boots All., Inc*., 470 F. Supp. 3d 534, 553 (D.S.C. 2020), aff'd, Case No. 20-1767, 2021 WL 4859603 (4th Cir. Oct. 19, 2021) (*citing Whitlaw v. Kroger Co*., 410 S.E.2d 251 (1991)). As stated in the foregoing paragraph, the "essential purpose of the statute" in which S.C. Code § 43-35-87(H) is contained is to "provide civil and criminal penalties to perpetrators of the abuse, neglect, or exploitation of vulnerable adults." Further, the stated

purpose of the specific section in question is to "authorize financial institutions to decline certain transaction requests in cases of the suspected financial exploitation of vulnerable adults." Thus, the statute as a whole is aimed at protecting vulnerable adults from exploitation. Plaintiff clearly has been exploited, as she has had nearly $100,000 of her own money stolen by scammers who took advantage of her advanced age an unfamiliarity with technology to pose as Microsoft Support workers. By doing this, they were able to exploit her financially, stealing a hefty portion of her assets. Further, the purpose of the specific section in question is to authorize institutions like Defendant Westcliff to prevent people like Plaintiff from undergoing financial exploitation by preventing them depositing large sums as a victim of a scam. Thus, this is clearly the type of harm that the statute was designed to prevent.

Finally, Plaintiff was clearly "a member of the class of persons the statute is intended to protect." *Walgreens*, 470 F. Supp. 3d at 553. The class intended to be protected by this statute is clearly "vulnerable adults." As defined by S.C. Code § 43-35-10(11), a "vulnerable adult is

> [A] person eighteen years of age or older who has a physical or mental condition which substantially impairs the person from adequately providing for his or her own care or protection. This includes a person who is impaired in the ability to adequately provide for the person's own care or protection because of the infirmities of aging including, but not limited to, organic brain damage, advanced age, and physical, mental, or emotional dysfunction.

2.

S.C. Code § 43-35-10(11). Plaintiff is a vulnerable adult because she is of the advanced age of 73 years old, lives with a monthly income close to the poverty line, and was clearly exploited out of nearly $100,000 dollars, which indicates a lack of ability to "adequately provid[e]" for her "own care or protection." Because of her advanced age and unfamiliarity with the technology involved, Plaintiff was unable to protect herself from exploitation of a significant portion of her wealth and was unable to care for financial well-being. Thus, she is a vulnerable adult and is a member of

the class that S.C. Code § 43-35-87(H) was enacted to protect. Accordingly, she has adequately

pled a cause of action for Negligence Per Se.


**2.**    **Plaintiff Was Owed a Duty of Care by Defendant Westcliff because she was a Customer of Westcliff.**

Plaintiff's Complaint alleges satisfactorily that Defendant failed to meet the require

elements of negligent supervision and training. Defendant argues that this cause of action fails

because Plaintiff failed to establish that Westcliff owed Plaintiff a duty of care. Westcliff

nonetheless clearly owed Plaintiff a duty of care as a customer of theirs.

South Carolina recognizes a cause of action for negligent supervision and training when

an employee intentionally harms another or when the employer has a legal duty of care arising

out of contract flowing to a Plaintiff not in privity. *Degenhart v. Knights of Columbus*, 309 S.C.

114 (1992); See also *Walgreens*, Case No. 20-1767, 2021 WL 4859603, at *7 (4th Cir. Oct. 19,

2021). Plaintiff alleges that Westcliff owed a duty of care to Plaintiff.

Defendant asserts that "South Carolina courts have expressly acknowledged that no

special duty of care exists between a bank and an ordinary customer," citing to the *Eisenberg v.*

*Wachovia Bank, N.A.* case to support this assertion. *Eisenberg v. Wachovia Bank*, N.A., 301 F.3d

220 (4th Cir. 2002). This is plainly an incorrect reading of *Eisenberg.* The case does say that

"banks do not owe a duty of care to noncustomers." *Eisenberg*, 301 F.3d at 226. It also says that:

> The mere fact that a bank account can be used in the course of perpetrating a fraud
> does not mean that banks have a duty to persons other than their own customers.
> To the contrary, the duty is owed exclusively to the customer, not to the persons
> with whom the customer has dealings.

*Eisenberg*, 301 F.3d at 225-26 (*quoting McCallum v. Rizzo,* 4 Mass. L. Rep. 397 (1995)). Thus,

while banks do not owe a duty to noncustomers, like the plaintiff in *Eisenberg*, they do owe it to

customers. In that case, the plaintiff was defrauded by a customer of Wachovia Bank, and the plaintiff sued Wachovia claiming that they were negligent in allowing the fraudster to hold a fraudulent account at their institution. The court there reasoned that this action could not withstand a motion to dismiss, because, though the fraudster was a customer of Wachovia, the plaintiff was not. Since banks do not owe a duty to non-customers, Wachovia owed no duty to the plaintiff. *Eisenberg*, 301 F.3d at 221-227.

Here, unlike *Eisenberg*, Plaintiff is the customer of Westcliff. Thus, Defendant Westcliff owes Plaintiff a duty of care.

### 3.    Plaintiff's negligence claim is not barred by the Economic Loss Rule, because Westcliff breached more than a mere contractual provision.

Defendant Westcliff argues that Plaintiff's action is barred by the Economic Loss Rule, but that is not the case, as Defendant Westcliff not only breached its contract with Plaintiff, but it also failed to comport with Industry Standards.  In fact, beyond industry standards, Westcliff has been warned by the United States government of **exactly** the type of senior financial exploitation scam that befell Plaintiff. (ECF. 8, ¶ 10).[4] Despite the foregoing, unlike other crypto kiosk / BTM providers who place a bold, express warning on their machines, Westcliff made the decision to forego such warnings that might have avoided Plaintiff's becoming a victim. (Id., at , ¶ 27). [5]

The economic loss rule is a recovery bar in negligence actions only where "duties are created *solely* by contract." *Eaton Corp. v. Trane Carolina Plains*, 350 F. Supp. 2d 699, 701

---

[4] see, https://consumer.ftc.gov/consumeralerts/2022/01/new-crypto-payment-scam-alert
[5] Of course, if no cash goes into the BTM, Westcliff cannot take its "fees."

(D.S.C. 2004) (emphasis in original) (citing *Kennedy v. Columbia Lumber and Mfg. Co., Inc*., 384 S.E.2d 730, 737 (S.C. 1989). Originally a creation of products liability law, the purpose of the economic loss rule is to "define the line between recovery in tort and recovery in contract." *Sapp v. Ford Motor Co*., 687 S.E.2d 47, 49 (S.C. 2009). The rule states that:

> Where a purchaser's expectations in a sale are frustrated because the product he bought is not working properly, his remedy is said to be in contract alone, for he has suffered only "**economic losses**." Conversely, where a purchaser buys a product which is defective and physically harms him, his remedy is in either tort or contract. This is so, ... because his losses are more than merely "economic."

> *Eaton*, 350 F. Supp. 2d 699, 701-02 (emphasis in original) (quoting Kennedy, at 345, 384 S.E.2d at 736)). Thus, while an alleged tortfeasor that *only* breaches the contract it has with a plaintiff is protected by the economic loss rule, if that alleged tortfeasor acts "in a way as to violate a legal duty [other than only contractual] . . . his liability is both in contract and in tort." *Kennedy* at 345.

One such way in which a defendant can be in violation of a legal duty that goes beyond the limitations of the economic loss rule is by the violation of "professional or industry standards." *Simons v. Wal-Mart Stores E., L.P*., Civil Action No. 8:11-cv-03180-JMC, 2013 U.S. Dist. LEXIS 14129 (D.S.C. Jan. 31, 2013). Accordingly, we analogize to *Simons v. Wal-Mart Stores E., L.P*. There, this Court held that the plaintiff's claim was not barred by the economic loss rule because the bank in that case failed to "comply with professional and industry standards when it mailed checks to the wrong address." *Simons*, Civil Action No. 8:11-cv-03180-JMC, 2013 U.S. Dist. LEXIS 14129 at *12. The court reasoned that

> South Carolina courts have held that the economic loss rule may not bar recovery in tort where a plaintiff is injured as a result of the defendant's failure to meet professional or industry standards. See *Tommy L. Griffin Plumbing & Heating Co. v. Jordan, Jones & Goulding, Inc.*, 320 S.C. 49, 55, 463 S.E.2d 85, 88 (1995) (finding design processional may be liable in tort because of duties owed separate and distinct from their contractual duties); see also, e.g., *Mitchell v. Holler*, 311

S.C. 406, 429 S.E.2d 793 (1993) (legal malpractice); *Beachwalk Villas Condominium Ass'n v. Martin*, 305 S.C. 144, 406 S.E.2d 372 (1991) (architect liability).

*Simons*, Civil Action No. 8:11-cv-03180-JMC, 2013 U.S. Dist. LEXIS 14129 at *12-13. Further, the Court reasoned that even though the plaintiff had not yet identified a particular industry standard, does not mean the claim was barred, because such a standard could be pled at a later day. *Id.* at *13.

Likewise, here, Defendant Westcliff failed to comply with an industry standard by allowing Plaintiff to deposit her life savings from the bank in a single transaction. Allowing an elderly person to deposit multiple tens of thousands of dollars in one go should cause any employee monitoring the transaction to think twice before allowing it. To allow a woman of Plaintiff's age to deposit such a ridiculous amount in one foul swoop is negligent to the point that laws, such as S.C. Code § 43-35-87(H) have been enacted to prevent such infractions. It is so much an industry standard that banks are specifically authorized by statute to "declining[e] transactions to disburse monies" to vulnerable adults. S.C. Code § 43-35-87(H). Thus, Defendant Westcliff here, as in the *Simons* case, violated industry standards by failing to prevent Plaintiff from withdrawing a significant portion of her life savings from the bank all at once. Thus, the violation by Defendant Westcliff is more than merely a breach of the contract between Plaintiff and Defendant Westcliff as a result of the Terms of Service Agreement between Plaintiff and Defendant Westcliff. Accordingly, her claims of Negligence are not barred by the "economic loss rule."

## D.  DEFENDANT'S ACTIONS WERE "ABNORMALLY DANGEROUS" AND THUS SUBJECT TO STRICT LIABILITY UNDER SECTION 520 OF THE RESTATEMENT OF TORTS

Strict liability refers to cases where liability is imposed on a party without finding that party was at fault. *Snow v. City of Columbia*, 409 S.E.2d 797, 800 (S.C. Ct. App. 1991). All that needs to be proven for such an action to prevail is that the tort occurred, and that the defendant was responsible. *See Wallace v. A. H. Guion & Co.*, 237 S.C. 349, 117 S.E.2d 359, 361 (S.C. 1960) ("Under what has been called the rule of absolute or strict liability, one lawfully engaged in blasting operations is, according to the weight of authority, liable without regard to the question of whether or not he has been negligent, whereby his acts in casting rocks or other debris on adjoining or neighboring premises or highways he causes direct damage to property or causes direct injury to persons thereon."). While it is true that South Carolina's common law jurisprudence on strict liability is generally "limited to a few narrowly defined categories such as cattle trespass, public callings, certain kinds of nuisances, and ultra-hazardous activities . . . the designation of an activity as abnormally dangerous nonetheless is *decided on a case-by-case basis.*" *Ravan v. Greenville Cnty.*, 434 S.E.2d 296, 304, (S.C. Ct. App. 1993) (citing *Snow*, 409 S.E.2d at 800; *T & E Indus., Inc. v. Safety Light Corp.*, 587 A.2d 1249 (N.J. 1991)).

The determination of whether or not an action falls under the umbrella of strict liability as an "abnormally dangerous activity" is based on the factors prescribed by the Second Restatement of Torts, section 520. The factors are:

> (a)  existence of a high degree of risk of some harm to the person, land or chattels of others; (b)  likelihood that the harm that results from it will be great; (c)  inability to eliminate the risk by the exercise of reasonable care; (d)  extent to which the activity is not a matter of common usage; (e)  inappropriateness of the activity to the place where it is carried on; and (f)  extent to which its value to the community is outweighed by its dangerous attributes.

19

Restat. 2d of Torts, § 520. First, the operation of a bitcoin ATM does create an "existence of a high degree of risk of harm to the . . . chattels of others." *Id.* Bitcoin is a highly volatile enterprise, with the market fluctuating to such a high degree that those unfamiliar with the ins and outs of the specifics of the currency are highly susceptible to significant financial loss. Plaintiff is. 73 year old woman who is, by her own admission, not technologically savvy. Bitcoin is an entirely online currency, one that is confusing even to many who work with computers on a daily basis. (which Plaintiff does not). Thus, the mere existence of a bitcoin ATM poses a high degree of risk to the chattels of others.

Second, the operation of a bitcoin ATM has a high "likelihood that the harm that results from it will be great." *Id.* As previously stated, the bitcoin market is highly volatile. Thus, those without significant resources or know-how are likely to lose money, and that is especially true when large deposits are made, like those by the plaintiff. Thus, the likelihood of harm is great.

The ability to minimize risk by the exercise of reasonable care is negligible, because of the instability present in the bitcoin market. Those that operate bitcoin ATMs do not control the bitcoin market, so they are unable to prevent their customers from an extreme loss of funds, particularly when large deposits are made. Thus, there is an "inability to eliminate risk." *Id.*

Further, bitcoin ATMs are not a matter of common usage. While it is true that bitcoin has skyrocketed in popularity in the last few years, its usage as a currency is still fairly uncommon. Very few if any in-person retailers accept bitcoin as a method of payment. You cannot buy a coffee or a knick-knack with bitcoin. Further, few online retailers accept bitcoin either, including major ones like Amazon. https://bitpay.com/blog/use-bitcoin-on-amazon-other-crypto-to-buy-whatever-you-want/#:~:text=Does%20Amazon%20Accept%20Bitcoin%3F,Amazon%20gift%

20cards%20with%20crypto, (Last visited on January 2, 2023). Thus, bitcoin ATMs are not a matter of common usage.

Thus, while the operation of a bitcoin ATM may not meet every factor for the "abnormally dangerous activities" test present in Section 502, it does meet the majority, and is thus sufficient to withstand the 12(b)(6) motion to dismiss.

### E.  PLAINTIFF'S CLAIM FOR CONVERSION WITHSTANDS THE MOTION TO DISMISS BECAUSE DEFENDANT WESTCLIFF'S INTERFERENCE – AND CONTINUED RETENTION OF FUNDS – WAS AND IS "UNAUTHORIZED."

While Defendant Westcliff is correct in pointing out that Conversion requires "unauthorized" interference with property rights, they are incorrect that they acted with Plaintiff's consent in conducting all transactions, as that is the very point of this suit. *Moore v. Benson*, 390 S.C. 153, 162 (Ct. App. 2010). The Plaintiff has alleged, and alleged in the correct form, that Defendant's conduct with respect to the Plaintiff's withdrawal and subsequent deposit of her life savings into Defendant Westcliff's ATMs was untoward and unauthorized. In support of their assertion that their actions were in fact authorized, they submit contracts between Plaintiff and Defendant.

A 12(b)(6) motion is only an examination of the pleadings, not the sufficiency of evidence underlying the allegations. In examining such a motion, "the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff. *Ostrzenski v. Seigel*, 177 F.3d 245, 251 (4th Cir. 1999). Whether or not these allegations will withstand scrutiny upon inspection of the evidence is a matter for trial or summary judgment, not a motion to dismiss. Thus, Defendant's reliance on contract is misplaced when all factual allegations in the complaint are to be assumed to be true.

21

Further, this claim is not barred by the economic loss rule, as stated above in section 3 of this pleading.

### F. PLAINTIFF'S CLAIM FOR UNJUST ENRICHMENT IS AMPLY PLED, AND HER INITIAL BELIEF THAT NOTHING "UNTOWARD" WAS HAPPENING IS IMMATERIAL.

Finally, Defendant Westcliff argues that Plaintiff's claim for Unjust Enrichment is untenable because "Plaintiff herself assured Westcliff that nothing untoward was happening with her account/wallet." (ECF 9, p. 9). This is immaterial, because though Plaintiff may have thought that at the time, she has obviously since learned new information that led her to believe otherwise. When she made that assertion, she was still in the process of being scammed, and was thus unaware of this fact. Thus, this statement is immaterial and not a valid reason to dismiss the Plaintiff's Unjust Enrichment Claim.  Further, this claim is not barred by the economic loss rule, as stated above in section 3 of this pleading.

In the end, Plaintiff's initial "belief" is the same as every other victim losing their money in scams involving BTM's.  None of these seniors, obviously, would put their who lose their life and retirement savings to crypto kiosks would do so absent an initial belief that the transaction was legitimate.  Westcliff, having been warned of these scams, could have chosen to prevent them, possibly for the cost of warning sticker.  It chose not to and, instead, chose to rest upon the "appearance" of legitimacy and complex, boilerplate terms of service, as justification for keeping a portion of funds that all agree have been stolen.  The Court should refuse to allow this.

## V.    CONCLUSION

WHEREFORE, for the foregoing reasons, Plaintiff, Christine Borden respectfully requests that this Court deny Defendant's Motion to Dismiss her Amended Complaint.

Respectfully submitted,

/s/ David Maxfield
David Maxfield, Esq., Fed ID 6293
David Maxfield, Attorney, LLC
PO Box 11865
Columbia, SC 29211
Telephone: (803) 509-6800
Facsimile: (855) 299-1656
dave@consumerlawsc.com

*Attorney for Plaintiff*

January 23, 2023